Leonard WILENSKY, et al., Plaintiffs,

v.

DIGITAL EQUIPMENT CORPORATION,
et al., Defendants.

Merry Lou SHAW, et al., Plaintiffs,

v.

DIGITAL EQUIPMENT CORPORATION,
et al., Defendants.

Charles E. LONERGAN,
Jr., et al., Plaintiffs,

v.

DIGITAL EQUIPMENT CORPORATION,
et al., Defendants.

Civ. A. Nos. 94–10752–JLT, 94–
10759–JLT, 94–10940–JLT.

United States District Court,
D. Massachusetts.

Aug. 8, 1995.

Philip M. Giordano, Giordano & Champa, P.A., Boston, MA, Ray Siderius, Siderious & Lonergan, Seattle, WA, for plaintiffs in No. 94–CV–10940.

Edmund C. Case, Jordan D. Hershman, Testa, Hurwitz & Thibeault, Randall W. Bodner, John D. Donovan, Jr., William L. Patton, Daniel J. Klau, Ropes & Gray, Boston, MA, for defendants in No. 94CV10940, 94CV10759.

Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, David Bershad, Steven Schulman, Jeffrey S. Abraham, Milberg, Weiss, Bershad Specthrie & Lerarch, New York City, Richard Schiffrin, Schiffrin & Craig, Bala Cynwyd, PA, for plaintiff in No. 94CV10759.

Edward F. Haber, Shapiro, Grace & Haber, Glen DeValerio, Berman, DeValerio & Pease, Boston, MA, for plaintiffs in No. 94CV10752.

Gerald F. Rath, Robert A. Buhlman, Bingham, Dana & Gould, Boston, MA, for defendants in No. 94CV10752.

### MEMORANDUM

TAURO, Chief Judge.

On March 21, 1994, the Digital Equipment Corporation ("Digital") began a public offering of 16 million shares of Series A, Eight and ⅞% Cumulative Preferred Stock. This offering allowed Digital to raise $400 million of much-needed capital.

Three weeks later, Digital issued quarterly data that revealed huge losses. Digital's stock suffered considerably, and dozens of lawsuits followed. These were eventually consolidated into the three cases currently before this court: *Shaw v. Digital,* C.A. 94–10759–JLT ("*Shaw*"); *Wilensky v. Digital,* C.A. 94–10752–JLT, ("*Wilensky*"); and *Lonergan v. Digital,* C.A. 94–10940–JLT ("*Lonergan*").

Although couched in different terms,[1] the three complaints sound similar stories. Each contains allegations that Digital failed to disclose poor performance data in the period leading up to the offering, and that this failure rendered other statements attributable to Digital incomplete, false, and otherwise misleading. Presently at issue are defendants' motions to dismiss each of these consolidated cases.

### I. BACKGROUND

When viewed in the light most favorable to the pleader, *Scheuer v. Rhodes,* 416 U.S. 232, 236, 94 S.Ct. 1683, 1686, 40 L.Ed.2d 90 (1974), the complaints reveal the following sequence of events.[2]

In July of 1992, following a series of "operational and financial reverses," Digital's Board of Directors moved to replace its founder and president, Kenneth Olsen. Olsen was replaced by defendant Robert Palmer, who was named President and Chief Executive Officer effective October, 1992. Earlier in the summer, defendant William Steul had been named Chief Financial Officer by Olsen.

Both moves roughly coincided with Digital's release of a new product, the Alpha computer chip. Plans were made to reorganize Digital's sales and marketing strategies in order to enhance the "market penetration" of the Alpha chip.

---

1. *Shaw* is primarily a 10b–5 action brought on behalf of persons who purchased Digital common stock between January 19, 1994, and April 15, 1994. *Lonergan,* like *Shaw,* includes a claim under 10b–5, and adds claims under sections 11 and 12(2). *Lonergan* limits its class to purchasers of Digital Cumulative Preferred Stock between March 21, 1994, and April 15, 1995. *Wilensky,* unlike *Shaw* and *Lonergan,* is brought only under sections 11 and 12(2). The putative *Wilensky* class includes purchasers of Digital Cumulative Preferred between March 21, 1994, and April 15, 1994.

2. This statement of facts is based primarily on the complaint filed in *Shaw.* The *Shaw* complaint, as the most exhaustive of the three filed, subsumes all relevant allegations contained in both *Lonergan* and *Wilensky.*

Although the company continued to report losses, results in the first two quarters of fiscal 1994 surpassed those of a year earlier. Digital officers reacted favorably to the company's improving position, expressing cautious optimism in statements to shareholders, analysts, and the press. Against this backdrop, Digital prepared for the March 21, 1994 public stock offering.

The offering succeeded in raising upwards of $400 million. Soon thereafter, on April 15, 1994, Digital announced its results for the third quarter of fiscal 1994, showing significant losses, both in absolute terms and in comparison with the company's third-quarter performance a year earlier. The markets reacted quickly, and in two days of trading Digital's stock lost more than twenty-five percent of its value. These lawsuits followed.

## II. ANALYSIS

### A. *WILENSKY*

*Wilensky*, unlike *Shaw* and *Lonergan*, does not contain a claim for relief under section 10(b) and Rule 10b–5. *Wilensky*, rather, was intentionally drafted to omit claims of fraud, and is limited to claims brought under sections 11 and 12(2).[3]

In opposing the defendants' motions to dismiss, the *Wilensky* plaintiffs specifically cite two passages of the March 21 prospectus supplement. The plaintiffs claim that these statements are actionable not for what they say, but for what they omit.

The first passage relates to Digital's Alpha "market-penetration strategy." The prospectus supplement, at page S–7, reads as follows:

The Corporation continues to take actions to respond to changes in industry demand, economic conditions and other facts affect-

ing the Corporation's business. In October 1993, the Corporation announced new open client-server products and related software and service products. The Corporation continues to seek alliances with other companies and to focus its resources in order to offer products which meet customer needs for open systems. Just after the close of the second quarter, the Corporation announced that it had hired a new general manager to lead its European operations. *The Corporation also is focusing on increasing market penetration by improving its direct sales efforts targeting the growing small and medium enterprise information technology market and expanding its use of resellers and other indirect channels of distribution.*

*March 21, 1994, Prospectus Supplement,* at S–7 (emphasis added).

The plaintiffs argue that this statement is misleading in two ways. First, the plaintiffs claim that the statement is actionable in that it omits certain details of the new sales strategy.[4] Second, the plaintiffs allege that the "market-penetration statement is incomplete in that it fails to disclose "declining sales and massive losses despite these actions and in omitting to disclose ... serious operational and functional problems. *Wilensky Complaint* at ¶ 72, *Shaw Complaint* at ¶ 113(a), (e), (i), (h). The plaintiffs, in other words, challenge Digital's non-disclosure of both the details and the results of the new sales strategy.

The second allegedly actionable statement refers to the adequacy of Digital's restructuring reserves. This passage reads:

While spending for R & E and SG & A is declining, the Corporation believes its cost and expense levels are still too high for the level and mix of total operating revenues.

---

3. To the extent that the court finds the prospectus and its supplements void of actionable omissions and misrepresentations, it is unnecessary to determine the standard of pleading required of claims couched in terms of sections 11 and 12(2) but clearly "sounding in fraud." *Compare Loan v. F.D.I.C.,* 717 F.Supp. 964 (D.Mass.1989) (heightened standard of pleading inapplicable to claims brought under sections 11 and 12(2)) *with Haft v. Eastland Financial Corp.,* 755 F.Supp. 1123 (D.R.I.1991) (Fed.R.Civ.P. 9(b) applies to any complaint "sounding in fraud") and *Lucia v.*

*Prospect Street High Income Portfolio, Inc.,* 769 F.Supp. 410 (D.Mass.1991), *aff'd,* 36 F.3d 170 (1st Cir.1994).

4. The plaintiffs maintain that these details, including "double commissions" to vendors and slashed profit margins on Digital products, would have allowed investors to foresee the extent of the pending decline in revenue. *Shaw Complaint* at § 113(c), (g), (j) and (k).

The Corporation is reducing expenses by streamlining its product offerings and selling and administrative practices, resulting in reductions in an employee population, closing and consolidation of facilities and reductions in discretionary spending. *The Corporation believes that the remaining restructuring reserve of $443 million is adequate to cover presently planned restructuring actions.* The Corporation will continue to take actions necessary to achieve a level of costs appropriate for its revenues and competitive for its business.

*March 21, 1994, Prospectus Supplement* at S–8 (emphasis added).

The plaintiffs claim that the statement is misleading because Digital knew or should have known that it would soon be forced to take "an enormous new restructuring charge." *Wilensky Complaint,* ¶¶ 73, 74(a)–(e), 76.

■ Upon careful review, the court finds that both statements, viewed in the context of the March 11 prospectus and its March 21 supplement, cannot be considered "so incomplete as to mislead." *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (*en banc*). In fact, the prospectus supplement contains an abundance of cautionary language. The prospectus and its supplement, in other words, "bespeak caution," both in general and with specific reference to the alleged misrepresentations cited by the plaintiffs. *See generally, In re Worlds of Wonder Securities Litigation,* 35 F.3d 1407, 1413–15 (9th Cir.1994) (describing origin and scope of the 'bespeaks caution' doctrine).[5]

With respect to Digital's sales strategy, the prospectus supplement contains an extensive "Discussion and Analysis of Results of Operations and Financial Condition." *Prospectus Supp.* at S–7. In this discussion, Digital candidly refers to "a significant decrease in European revenues, as well as a decline in U.S. revenues ..." On the following page, the supplement notes decreasing gross profits, and attributes the decline to a "decrease in product sales," coupled with lower profit margins on Alpha based systems and "competitive pricing pressures." *Id.* at S–8.

■ These statements do not disclose particular sales strategies, but they do reflect shrinking revenue in a difficult market.[6] To the extent that the allegedly actionable statements indicate otherwise, they fall short of the specificity required of an actionable statement. *See, e.g., Rand v. Cullinet Software, Inc.,* 847 F.Supp. 200, 208 (D.Mass. 1994), *Colby v. Hologic, Inc.,* 817 F.Supp. 204, 211 (D.Mass.1993).

■ Likewise, in commenting on the perceived adequacy of the current restructuring reserve, the prospectus supplement warns that "[t]he Corporation will continue to take actions necessary to achieve a level of costs appropriate for its revenues and competitive for its business." *Prospectus Supp.* at S–8. This language follows immediately on the heels of a statement about "presently planned" restructuring reserves.

Again, Digital's statement must be viewed in the context of the company's overall appraisal of its condition. The restructuring statement, in the context of the previously announced decline in revenue and the pledge to continue to take adequate "action," clearly conveys the possibility of additional restructuring charges.

---

5. The 'bespeaks caution' doctrine, as applied by most courts, "merely reflects the unremarkable proposition that statements must be analyzed in context." *Rubinstein v. Collins,* 20 F.3d 160, 167 (5th Cir.1994) (*citing In re Donald J. Trump Casino Securities Litig.,* 7 F.3d 357, 364 (3d Cir. 1993)).

6. Digital's failure to disclose details of its sales plans is not, in and of itself, an actionable omission. *In re Philip Morris Sec. Litig.,* 872 F.Supp. 97, 102 (S.D.N.Y.1995) ("no court has ever required a company to keep the investing market apprised of its marketing plans"). The omission of particular details about the sales strategy would be actionable only if the omission of these details made other disclosures "so incomplete as to mislead." *Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (*en banc*). For reasons discussed later this memorandum, *infra* page 180, this cannot be said of Digital's disclosures in the March 21 Prospectus Supplement. Accordingly, if the court is to find an omission, it must be in the failure to disclose the performance, not the content, of the marketing plan.

## B. *SHAW*

In addition to the passages cited above, the *Shaw* plaintiffs point to a long series of statements and omissions that evince an intent to defraud the market in violation of section 10(b).[7] In a summary of actionable omissions and misrepresentations, the *Shaw* plaintiffs identify three basis of liability under Rule 10b–5. First, the plaintiffs identify several class-period misrepresentations. Second, the plaintiffs identify three instances in which the corporation failed to disclose material information. Finally, the plaintiffs identify four specific pre-class statements that the corporation failed to update, thereby rendering these statements false and misleading.

### 1. *class-period misrepresentations*

■ In addition to the alleged restructuring-reserve misrepresentation, discussed *supra*, the plaintiffs point to a series of statements, newspaper articles, and analyst reports as evidence of the defendants' intent to deceive the markets. They argue that these statements, individually and as a whole, painted a misleading picture of Digital's financial condition.

Again, however, the statements cited by the plaintiffs universally reflect a significant degree of caution. In each instance, the cautionary language speaks directly to the statement at issue. When read to include this cautionary language, the statements cited by the plaintiffs cannot be construed as material misrepresentations designed to mislead the market. *In re Worlds of Wonder Securities Litigation*, 35 F.3d 1407, 1415 (9th Cir.1994).

For example, the defendants point to a series of alleged misrepresentations concerning Digital's near-term financial prospects. On January 20, 1994, a Boston Herald article analyzed Digital's $72.1 million second quarter loss. In the course of the article, Digital CFO William Steul is quoted as saying that Digital's transition to the Alpha chip " 'is going reasonably well ... even if it doesn't meet everybody's expectations, and we

should continue to make progress'." *Digital falls short with $72.1 M Loss*, Boston Herald, January 20, 1994, at p. 29. Later in the same article, Steul refuses to disavow earlier statements by Digital CEO Robert Palmer, in which Palmer had encouraged analysts to predict a break-even or profitable year. In refusing to disavow these statements, Steul told the Herald "break-even is not in the black." *Id.*

The plaintiffs cite this language, and specifically Steul's "break-even" comment, as a specific prediction with respect to the company's short term profits. The plaintiffs claim, in other words, that Steul was predicting "$0.00 in net income" for the current fiscal year. *Plaintiff's Summary of Actionable Misrepresentations and Omissions*, at 1.

Whether or not Steul's "break-even" comment, taken alone, can be construed as a prediction, the balance of the article dispels any notion that Steul's comment could reasonably be interpreted to convey a specific forecast. Asked point-blank when Digital would begin to show a profit, Steul told the Herald "I hesitate to give you an estimate because we just have too much uncertainty in the immediate future." Boston Herald, January 20, 1994, at p. 29.

Stripped of any actionable prediction, Steul's comments amount to a vague statement concerning the ongoing transition to the Alpha chip, which, in Steul's words, was going "reasonably well." This hopeful manifestation of optimism is not the type of statement which a reasonable investor "would consider significant in [making] the decision to invest, such that it alters the total mix of information available about the proposed investment." *Rubinstein v. Collins*, 20 F.3d 160, 168 (5th Cir.1994) (citations omitted).

Without exception, each of the plaintiffs' alleged class-period misrepresentations is similarly tempered by cautionary language. When Steul tells the New York Times that the transition to Alpha products "is going reasonably well," he does so only after saying

---

7. Again, the *Shaw* complaint is filed on behalf of a putative class comprised of all purchasers of Digital common stock between January 19 and April 15, 1994. The plaintiffs in *Shaw*, in other words, do not specifically tie their complaint to the March 21 offering.

that "[i]t took 5 years for Digital to get into this mess, and it would be hard to say we could turn it around in one or two quarters." *Digital Loss in 2d Quarter Stuns Market,* NEW YORK TIMES, January 20, 1994, at D1. A Digital internal review cited in the Wall Street Journal maintains that the corporation "[is] running close to break-even," and goes on to state that Digital "can make a profit this year." *Corporate Focus,* WALL STREET JOURNAL, February 23, 1994, at B4. The article, however, notes that the internal review concludes that "revenue is uncertain for the next two or three quarters," and the troubled company still "ha[s] a way to go." *Id.*

These statements, taken individually and as a whole, are so neutral in their tone and content as to defy any inference of an intent to mislead. The court concludes that the misrepresentations cited by the plaintiffs, when read in context, could not alter the investment decisions of a reasonable investor.

### 2. omissions

The omissions cited as actionable in *Shaw* fall into three broad categories.[8] In addition to the alleged omission regarding the adequacy of Digital's restructuring reserve, the plaintiffs cite the defendants' failure to divulge details of the Alpha marketing strategy and Digital's failure to "discuss problems affecting their European operations." *Shaw Plaintiffs' Summary of Actionable Misrepresentations and Omissions,* at 4 & n. 2, 3.

### a. restructuring activities.

■ The complaint charges that the defendants failed to disclose, among other things, that:

8.  For reasons cited in the context of the *Wilensky* action, *supra,* the court has found that the alleged omissions in the prospectus and its supplement are not actionable as a matter of law. The present discussion refers to statements and omissions made prior to the date of the offering, and applies primarily to those purchasers who purchased Digital stock before the publication of the prospectus supplement.

9.  When the restructuring effort was discussed, Digital officials consistently portrayed the effort as an ongoing attempt to control costs in the face of declining revenue. Although Steul, Palmer,

DEC had not achieved a competitive cost structure ... DEC was experiencing unacceptably long lead times for key products ... DEC's new commission-based sales force compensation system was dramatically increasing costs ... and ... DEC was not implementing announced head count reductions.

*Id.* at n. 3.

The company, however, made no specific representations with respect to the results of the ongoing restructuring effort.[9] It, therefore, could not be subject to a duty to reveal the specific financial results attributable to that effort.

■ To the extent that the plaintiffs complain about Digital's failure to disclose the performance, not the details, of the effort, it is sufficient to note that a corporation need not publicize forecasts of revenue and growth. *In re Computervision Corp. Securities Litigation,* 869 F.Supp. 56, 63 (D.Mass. 1994) (citing *Klein v. Maverick Tube Corp.,* 790 F.Supp. 68, 70 (S.D.N.Y.1991), *aff'd,* 969 F.2d 1041 (2d Cir.1992)).

### b. the Alpha marketing plan

■ Again, the analysis of alleged omissions regarding the Alpha marketing plan must begin with the premise that a corporation has no duty to disclose marketing strategy. *In re Philip Morris Sec. Litig.,* 872 F.Supp. at 102. Accordingly, the failure to disclose details about the marketing strategy may be found actionable only if the omissions of these details rendered other statements about the plan "so incomplete as to mislead." *Backman v. Polaroid,* 910 F.2d, at 16. Having reviewed the corporation's statements alongside the alleged omissions, the court

and other officials expressed concern with the pace of the turn-around effort, Digital's statements repeatedly emphasized that it might take several quarters before the company began to show progress. *Corporate Focus,* WALL STREET JOURNAL, February 23, 1994 at B4 (Palmer refers to transition to Alpha as "a multi-year process."); *Albatross,* FINANCIAL WORLD, March 29, 1994, at 36 (Steul reported as saying that "it took a couple of years to get where we are and it will take more than a couple of quarters to tum [sic] it around.").

concludes that the alleged omissions do not render Digital's statements false or misleading. This is particularly true when the alleged omissions are viewed in the light of the company's candid disclosure of all the risks and potential shortcomings of the new sales plan.

In an SEC 10–Q report filed for the quarter ending October 2, 1993, for example, Digital makes clear reference to a new "aggressive, competitive cost structure for its Alpha AXP systems." In the same report, Digital warns investors of "continued downward pressure on product gross margins." Other SEC filings, including the March 21 prospectus supplement, reflect similar candor.

In addition, Digital's officers consistently acknowledged the plan's risks in presenting it to the markets. Throughout the fall and winter of 1993 and 1994, Digital's S.E.C. filings are replete with references to shrinking profit margins in the face of competitive price pressures. *See Joint Appendix in Support of Defendants' Motions to Dismiss*, Exhibits 4–8.

### c. *European operations*

■ Finally, the plaintiffs note Digital's failure to disclose certain weaknesses in the company's European operations, while contemporaneously expressing optimism about European revenue. Recognizing that Digital eventually disclosed that European revenues were suffering, the plaintiffs claim that these disclosures are "ineffective" against those class members who purchased before these disclosures were made.

The plaintiffs specifically point to a statement made by Vincenzo Damiani, Digital's head of European operation, and reported in the Reuter Business Report of February 8, 1994. In the course of an interview, Damiani told Reuters "I am pretty optimistic about the fact that in the third and fourth quarters of our fiscal year ... we will be able to stabilize our revenue." *Digital Europe Chief Sees 5,000 to 6,000 Job Cuts*, REUTER BUSINESS REPORT, February 8, 1994.

As an initial matter, the court notes that at least one of the defendants' many disclosures with respect to declining European sales occurred early in the alleged class period, several days before the Damiani statements. In a 10–Q filed on February 4, 1994, Digital noted "a significant decrease in European revenues." *Defendants' Joint Appendix*, Exhibit 8, at 14.

In any event, the court finds that the statements contained in the Reuters report are too indefinite to form the basis of any liability. Damiani's comments, fairly read, are more in the nature of a wish than a prediction. First, the court notes that Damiani prefaces his statement by noting that he is "fairly optimistic" about the coming year. Second, Damiani refers only to the hope of stabilizing revenue. Taken as a whole, and read in the context of Digital's general condition, this statement cannot be read to contain a specific forecast about Digital's performance.

### C. *Lonergan*

■ *Lonergan*, like *Shaw*, contains claims based on sections 11 and 12(2) and a claim based on Rule 10b–5. To the extent that the allegations in *Shaw* and *Lonergan* overlap, it is not necessary to repeat the conclusions made in the preceding discussion of the *Shaw* complaint. The *Lonergan* complaint, however, adds a novel argument that requires separate attention. In addition to the actionable misrepresentations and omissions cited by the plaintiffs in *Wilensky* and *Shaw*, the *Lonergan* complaint adds a Rule 10b–5 claim "based primarily upon the undertakings included in the defendants' shelf registration filings with the [Securities and Exchange] Commission." (*Plaintiff's Supplemental Memorandum on Defendants' Motion to Dismiss* at 1). In addition, the complaint alleges a 10b–5 claim on the basis of Digital's violation of Item 303(a)(3)(i), (ii), 17 C.F.R. § 229.303.

The undertakings cited by the plaintiff are required by 17 C.F.R. § 230.415(a)(3), which requires that the registrant "furnish[ ] the undertakings required by Item 512(a) of Regulation S–K [17 C.F.R. Part 229]." Among the 512(a) undertakings is the promise to file post-effective amendments to its original registration statement. A registrant, therefore, undertakes to file a post-effective amendment to reflect "facts or

events arising after the effective date of the Registration Statement ... which, individually or in the aggregate, represent a fundamental change in the information set forth in the Registration Statement." 17 CFR § 229.512(a).

Item 303 of Regulation S–K, (17 C.F.R. § 229.303), provides guidelines for the yearly disclosure of "financial condition and results of operations." *Id.* Part (a)(3)(i) of that Item asks the registrant to "describe any unusual or infrequent events ... that materially affected the amount of reported income from continuing operations." Part (a)(3)(ii) calls on management to discuss "known trends or uncertainties that have had or that the registrant reasonably expects a material favorable or unfavorable impact on net sales or revenues or income from continuing operations."

In this case, Lonergan essentially argues that 10b–5 liability arises out of Digital's violations of Items 512(a) and 303. Specifically, the plaintiff cites Digital's failure to report the loss of $183 million as a violation of both items. For two independent reasons, the court determines that Lonergan's arguments must fail.

As a threshold matter, the court notes that the conduct charged by the plaintiff does not automatically state a claim under Rule 10b–5. With respect to Item 303, courts have repeatedly held that "a violation of an exchange rule will not support a private claim." *Kriendler v. Chemical Waste Management, Inc.,* 877 F.Supp. 1140, 1151 (N.D.Ill.1995) (*citing In re VeriFone Securities Litigation,* 11 F.3d 865 (9th Cir.1993)). While violation of an S.E.C. rule may perhaps constitute evidence of a 10(b) scheme to defraud,[10] courts have not allowed plaintiffs to plead violations of S.E.C. rules as a "surrogate" for 10(b) and 10b–5 analysis. *Kriendler,* 877

F.Supp. at 1157 (citing *VeriFone,* 11 F.3d at 870).

The same argument applies to the undertakings required by Item 512. If Digital is to be held liable in relation to these undertakings, it must be for a failure to comply with an undertaking, not the failure to comply with the S.E.C. Rule.[11]

In any event, the court notes that Item 512(a) does not impose a duty to reveal midquarter setbacks where the registrant has made no contrary representations in the prospectus. Imposing this duty as part of a 512(a) undertaking would conflict with the well-settled rule that a corporation has no obligation to report earnings in the middle of an ongoing quarter. *Computervision, supra,* at 62. In this case, Digital made no optimistic representations with respect to revenue. Again, Digital's filing with the SEC are replete with references to declining profit margins and a corresponding drop in revenue.

Item 303 is simply inapplicable to the allegations made in the *Lonergan* complaint. Item 303, on its face, applies only to yearly disclosures. *See Anderson v. Clow,* 1994 WL 525256 at *20 (S.D.Cal.) (citing *Alfus v. Pyramid Technology Corp.,* 745 F.Supp. 1511, 1517 (N.D.Cal.1990)). This court has found no instance in which Item 303 has been used to impose a duty of disclosure during an ongoing quarter. *Id.,* at *20 ("omitting Item 303(a) information from documents other than form 10–k does not violate Rule 10b–5").

## III. CONCLUSION

For the reasons stated in this memorandum, the court finds that the plaintiffs have failed to allege any statements or omissions that could be found actionable under the

---

10. The very relevance of an Item 303 violation to a 10b–5 suit remains subject to some dispute. *See, e.g., In re Caere Corporate Securities Litigation,* 837 F.Supp. 1054 n. 4 (N.D.Cal.1993) ("The fact that the defendant may or may not have violated Item 303 is irrelevant to Plaintiffs' Rule 10b–5 claims."); *In re Wells Fargo Securities Litigation,* 12 F.3d 922, 930 n. 6 (9th Cir.1993) (declining to decide relevance of Item 303 violation to 10b–5 claim).

11. In focusing on Rule 10b–5, the plaintiff has not argued that Digital's alleged violation of S.E.C. rules may give purchasers other enforceable rights under the securities laws. Accordingly, the court need not consider whether the failure to comply with an S.E.C. Rule may give rise to Securities Act claims other than those brought under Rule 10b–5.

securities laws. Accordingly, the defendants' motions to dismiss are ALLOWED.

An order will issue.