**In re BOSTON TECHNOLOGY, INC. SECURITIES LITIGATION.**

No. 96–12567–MEL.

United States District Court, D. Massachusetts.

Feb. 5, 1998.

50

Glen DeValerio, Jeffrey C Block, Berman, DeValerio & Pease, Boston, MA, Steven Schulman, Deborah Clark–Weintraub, Milberg, Weiss, Bershad Specthrie & Lerach, New York City, M. Richard Komins, Barrack, Rodos & Bacine, Philadelphia, PA, Richard H. Weiss, Milberg, Weiss, Bershad, Hynes & Lerach, New York City, for Plaintiffs.

William H. Paine, Jeffrey B. Rudman, Michael G. Bongiorno, Hale & Dorr, Boston, MA, Jay A. Dubow, Wolf, Block, Schorr & Solis–Cohen, Philadelphia, PA, for Defendants.

## MEMORANDUM AND ORDER

LASKER, District Judge.

This is a securities fraud action against Boston Technology, Inc. ("BT") and six of its officers and directors.[1] The Amended Consolidated Complaint was filed on behalf of all persons who purchased BT stock during the period from May 17, 1995, through November 15, 1995 (the proposed "class period"). The conduct at issue is said to have violated Sections 10(b) and 20(a) of the Securities Exchange Act of 1934, 15 U.S.C. §§ 78j(b), 78t(a), and the corresponding Securities and Exchange Commission ("SEC") Rule 10b–5, 17 C.F.R. § 240.10b–5. Plaintiffs allege that both before and during the proposed class period, defendants either made or were otherwise responsible for a number of statements, each of which artificially inflated the price of BT stock. The "fraud" is said to stem from defendants' not having disclosed publicly various facts which plaintiffs say were known to defendants and rendered the actual statements false and misleading.[2] Defendants move, pursuant to Fed.R.Civ.P. 12(b)(6), to dismiss the Complaint for failure to state a claim upon which relief can be granted and for failure to plead with the particularity required by Fed.R.Civ.P. 9(b). The Motion to Dismiss is granted in full, on both 9(b) and 12(b)(6) grounds.

### I. Introduction

BT is a Massachusetts-based corporation in the business of developing, manufacturing, marketing and providing support services for a comprehensive family of voice and information processing systems. The company's customers are primarily telecommunications service providers, including telephone companies and wireless service providers. The market served is domestic and international.

Plaintiffs allege that before and during the class period, defendants disseminated—either directly or through industry analysts—a stream of positive statements concerning new products, contracts, and relationships with customers. The Complaint characterizes defendants' having done so as culpably "represent[ing] that [BT] was well-positioned to compete in the voice processing industry and that it would continue to experience substantial sales of its products and profit growth."

The 20 statements raised by plaintiffs are said to have been "false[3] and misleading" by virtue of defendants' failure to inform the public of certain facts. Plaintiffs claim that defendants thereby bore a duty to disclose those facts.[4] While some additional, more particularized allegations of omission appear throughout the Complaint, plaintiffs focus their case on nondisclosure of the following four facts: (1) BT was losing its most important customer (Bell Atlantic); (2) BT's new product line had technological problems which would prevent its commercial acceptance; (3) as BT's foreign sales increased as a percentage of total sales, the factors characteristic of international business, such as a longer sales cycle, extended payment terms, and the installation of smaller systems with lower margins, would have a material negative impact on future revenues and earnings; and (4) there existed a general weakness in

---

1. The individual defendants are: William J. Burke, Greg C. Carr, Paul W. Delacey, Francis E. Girard, Joseph E. Norberg, and John C.W. Taylor. At all times relevant to this action, these persons served in the capacities of: Chairman of the Board of Directors (Carr); Member, Board of Directors (Norberg); President and Chief Executive Officer (Taylor); Executive Vice President and Chief Operating Officer (Delacey); Executive Vice President of World Sales (Girard); and Vice President of Corporate Planning (Burke).

2. The putative "statements" are actually, in many if not most instances, collections of multiple announcements or comments on unrelated topics. Despite this lack of relatedness, each such collection is treated here as a single "statement."

3. While plaintiffs use the term "false" here, the literal truth of all but the above-mentioned two statements is apparently not in dispute.

4. Six of the statements in the case were uttered by industry analysts. Where a statement is made by another, the duty to disclose is more aptly referred to by some courts as a duty "to correct."

demand for BT's products.[5]

According to plaintiffs, the "truth . . . began to emerge on November 15, 1995," when the company announced that it "would report a $0.14 per share loss in the third fiscal quarter . . .", and "was experiencing a significant shortfall due to an inability to close 'on certain key orders' and long-term weakness of demand for its products from its most important customers." The Complaint further alleges that "[a]s a result of [these] disclosures, the price of [BT] stock plunged and eventually closed down $2.8125 per share (an intra-day decline of over 20%), closing at $11.0625 per share on November 15 on extremely high volume of over 5 million shares." [6]

Finally, the Complaint alleges that the individual defendants concealed the omitted information for personal financial gain. It alleges in particular that during the class period, these defendants cumulatively sold 318,000 shares of BT stock for over $5 million.

## II. Applicable Law

### A. *Essential Elements*

Section 10(b) of the Securities and Exchange Act of 1934 makes it unlawful:

> To use or employ, in connection with the purchase or sale of any security . . ., any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the [SEC] may prescribe as necessary or appropriate in the public interest or for the protection of investors.

15 U.S.C. § 78j(b). Rule 10b–5 provides in relevant part:

> It shall be unlawful for any person, directly or indirectly, . . . [t]o make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of

the circumstances under which they were made, not misleading . . . .

17 C.F.R. § 240.10b–5.

To state a claim under Section 10(b) and Rule 10b–5, a plaintiff must allege that: (1) in connection with the purchase or sale of securities, (2) the defendant made a false statement or omitted a material fact, (3) with the requisite scienter, and that (4) plaintiff relied on the statement or omission, (5) with resultant injury. *Gross v. Summa Four, Inc.*, 93 F.3d 987, 992 (1st Cir.1996); *Shaw v. Digital Equip. Corp.*, 82 F.3d 1194, 1216–17 (1st Cir.1996).

A misrepresentation or omission is material and thereby actionable only if a reasonable investor would have viewed it as "having significantly altered the total mix of information made available." *Basic, Inc. v. Levinson*, 485 U.S. 224, 232, 108 S.Ct. 978, 99 L.Ed.2d 194 (1988); *Gross*, 93 F.3d at 992. An omission is material if "a reasonable investor might have considered [it] important in the making of [the investment] decision." *Roeder v. Alpha Indus., Inc.*, 814 F.2d 22, 25 (1st Cir.1987) (quotation omitted). As to scienter, a plaintiff must plead "a mental state embracing [an] intent to deceive, manipulate or defraud." *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 194 n. 12, 96 S.Ct. 1375, 47 L.Ed.2d 668 (1976).

The 10b–5 plaintiff must also meet the requirements of Fed.R.Civ.P. 9(b), which provides that "[i]n all averments of fraud . . ., the circumstances constituting the fraud . . . shall be stated with particularity." The particularity requirement is regarded by the Court of Appeals for this Circuit as being of fundamental importance. Noting that it was "especially strict in demanding adherence to Rule 9(b) in the securities context," [7] the Court in *Gross* reiterated that:

---

**5.** These facts are raised throughout this opinion by reference to the "generally applicable allegations of omission."

**6.** It is worth noting that within seven trading days, the price of BT stock rebounded. The closing prices per share for the days from November 27 through November 30, 1995, were, respectively: $15¼, $14¾, $14¼, and $14⅜.

**7.** The Court recently explained that the goal in setting "a demanding standard" in this context is to "minimize the chance that a plaintiff with a largely groundless claim will bring a suit and conduct extensive discovery in the hopes of obtaining an increased settlement, rather than in the hopes that the process will reveal relevant evidence." *Gross v. Summa Four, Inc.*, 93 F.3d 987, 991 (1st Cir.1996) (quotation omitted).

[G]eneral averments of defendants' knowledge of material falsity will not suffice. Consistent with [the Rule], the complaint must set forth *specific facts* that make it reasonable to believe that the defendant knew that a statement was materially false or misleading. The rule requires that the *particular times, dates, places, or other details* of the alleged fraudulent involvement of the actors be alleged.

93 F.3d at 991 (quotation omitted) (emphasis supplied).

██ A 10b–5 plaintiff cannot satisfy the requirements of Rule 9(b) merely by pleading "fraud by hindsight." *Id.* A general averment that defendants made a statement knowing at the time what later "turned out badly" does not suffice. *Id.* In *Serabian v. Amoskeag Bank Shares, Inc.*, 24 F.3d 357, 367 (1st Cir.1994), the Court reiterated the "well established" rule that there is no liability where a plaintiff's claim rests on the assumption that defendants "must have known of the severity of their problems earlier because conditions became so bad later on." Notably, the pleading requirement is as strictly construed even when "relat[ing] to matters peculiarly within the defendant's knowledge." *Romani v. Shearson Lehman Hutton,* 929 F.2d 875, 878 (1st Cir.1991). Accordingly, the First Circuit looks cautiously upon plaintiffs alleging fraud purely on the basis of information and belief. When plaintiffs do so, either explicitly or implicitly, "the complaint must set forth the source of the information and the reasons for the belief." *Id.* In the end, to make a sufficient claim, a 10b–5 plaintiff must allege facts that give rise to a "strong" inference of fraudulent intent. *Suna v. Bailey Corp.,* 107 F.3d 64, 68 (1st Cir.1997).

### B. *The Duty to Disclose*

██ The mere failure of a corporation to disclose all non-public material information in its possession is not actionable fraud, as Rule 10b–5 does not create an affirmative duty to disclose. *Gross,* 93 F.3d at 992. For

purposes of the instant case,[8] a duty to disclose arises only when the issuer has made "a statement of material fact that is either false, inaccurate, incomplete, or misleading in light of the undisclosed information." *Id.* A statement is not rendered misleading by omission merely because the undisclosed fact bears some relation to the subject matter of the statement. For example, it is the law of this Circuit that:

[The duty rule] does not mean that by revealing one fact about a product, one must reveal all others that, too, would be interesting, market-wise, but means only such others, if any, that are needed so that what was revealed would not be so incomplete as to mislead.

*Backman v. Polaroid Corp.,* 910 F.2d 10, 16 (1st Cir.1990) (en banc) (quotation omitted). In sum, a duty to disclose arises only where both the statement made is material, and the omitted fact is material to the statement in that it alters the meaning of the statement.

██ Occasionally, a statement's potential to mislead is said to be negated by contemporaneous, cautionary language. *See Shaw,* 82 F.3d at 1213. The "bespeaks caution" doctrine "is essentially shorthand for the well-established principle that a statement or omission must be considered in context." *Id.* (quoting *In re Donald J. Trump Casino Sec. Litig.,* 7 F.3d 357, 364 (3d Cir. 1993), *cert. denied,* 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994)). Where a forecast or prediction is accompanied by cautionary disclosures that adequately warn that things may turn out differently, it is, as a matter of law, not materially misleading. *Id.* The cautionary language must be sufficiently related in subject matter and strong in tone to counter the statement made. *See, e.g., Glassman v. Computervision Corp.,* 90 F.3d 617, 635 (1st Cir.1996). The sum of the enunciated rules is that when an issuer opts to make a statement, that statement must be "complete and accurate." *Gross,* 93 F.3d at 992.

---

**8.** There are two other contexts that may give rise to a duty to disclose material facts—insider trading on the basis of non-public information, and statutory or regulatory mandate. *See Shaw v.*

*Digital Equip. Corp.,* 82 F.3d 1194, 1202 n. 3 (1st Cir.1996). Neither is properly at issue in this case.

## C. *Other Applicable Rules*

Several rules have emerged in the First Circuit that are of particular significance in this case. Primary among them is the rule that exaggerated, vague, or loosely optimistic statements about a company are not actionable under Rule 10b–5. *See Gross,* 93 F.3d at 995. Vague predictions about the prospects for a new product, *see Glassman,* 90 F.3d at 635–36 (product "will attract new customers"), or for a company in general, *see Colby v. Hologic, Inc.,* 817 F.Supp. 204, 211 (D.Mass.1993) ("[p]rospects for long term growth are bright"), are examples of such non-actionable statements. The rule covers loose optimism about both an issuer's *current* state of affairs and its *future* prospects. *See In re Chipcom Corp. Sec. Litig.,* No. 95–11114, slip op. at 24 (D.Mass. April 29, 1996). *See also Shaw,* 82 F.3d at 1219 (statement that things were "[currently] going reasonably well" and statement that the company "should show progress [in the future]" both ruled immaterial). Such loose optimism is often referred to as "puffing," *see id.* at 1217–18 n. 32—a term which is based on the assumption that prospective "investors know how to devalue the optimism of corporate executives." *See Schaffer v. Timberland Co.,* 924 F.Supp. 1298, 1313 (D.N.H.1996) (quotation omitted). The Court in *Shaw* explained that truly loose optimism or "self-directed corporate puffery" is not actionable because "[t]he market is not that easily duped," 82 F.3d at 1218. In other words, it would be patently unreasonable for an investor to consider "puffery" when engaged in investment decisionmaking. *See In re Healthco Int'l, Inc. Sec. Litig.,* 777 F.Supp. 109, 115 (D.Mass.1991).

Equally important to this case is the rule that an issuer's having accurately reported past successes does not give rise to a duty to tell the public that at present its conditions or prospects are less positive. *See Shaw,* 82 F.3d at 1202; *Serabian,* 24 F.3d at 361 (no duty, "even if present circumstances are less rosy"). Indeed, in *Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 8 (1991), the First Circuit held that a report of past earnings did not subject the issuer to liability even where the earnings rate itself was expected to decline. The rationale behind the rule is, of course, tied to the concept of materiality—it would be unreasonable for someone to take a report strictly concerned with the past as a representation about the future, and therefore such a report is per se immaterial to the investment decision.[9]

Finally, optimistic predictions "that prove to be off the mark"—even the most specific ones—are not actionable under 10b–5 unless there was intentional deception on the part of the defendant. *Serabian,* 24 F.3d at 361. As a result, a 10b–5 complaint must allege either a lack of good faith on the defendant's part or a lack of reasonableness of the statement in question. *Colby,* 817 F.Supp. at 211. Courts of Appeals have explained this rule by noting that the federal securities laws were not intended to cover what is commonly referred to as "fraud by hindsight." *See, e.g., Greenstone v. Cambex Corp.,* 975 F.2d 22, 25–27 (1st Cir.1992). Absent bad faith, a defendant must have had—at the time the statement was made—knowledge of specific facts making the statement unreasonable. There is simply no liability where a plaintiff's claim rests on the assumption that defendants "must have known of the severity of their problems earlier because conditions became so bad later on." *Serabian,* 24 F.3d at 367.[10]

---

**9.** The First Circuit has recognized that the rule "might" be different "if the defendant's apprehension was of a disaster." *See Capri Optics Profit Sharing v. Digital Equip. Corp.,* 950 F.2d 5, 8 (1st Cir.1991). While the Court has not addressed the possibility of this exception further, the Complaint in the instant case does not provide the basis for an inference of anticipated "disaster."

**10.** Predictions made in required SEC filings are similarly protected by the "safe harbor" provisions of SEC Rule 3b–6, 17 C.F.R. § 240.3b–6. The Rule provides that forward-looking statements, when made in good faith and upon reasonable factual bases, are not actionable. *See Arazie v. Mullane,* 2 F.3d 1456, 1465–68 (7th Cir.1993). Thus, to allege a viable fraud claim based on a prediction in an SEC filing, a plaintiff must plead either bad faith or a lack of reasonableness.

## D. *Liability for Analyst Statements*

Several of the statements raised by plaintiffs in this case were made not by defendants, but by industry analysts from various independent securities firms. Plaintiffs contend that the defendants are nevertheless liable for these "analyst statements" by virtue of having failed to correct them. As with the other 14 statements, the Complaint alleges that defendants knew but failed to disclose various pieces of information the omission of which rendered the statements misleading.

While several Courts of Appeals have held that an issuer may be liable for statements made about its stock by outside analysts, the First Circuit has not spoken definitively on the subject. In *Suna*, the Court declined to reach the ultimate issue of whether an action against the issuer may lie on the basis of analyst statements. 107 F.3d at 73. It went on, however, to dismiss the case on grounds of plaintiffs' failure to plead the issuer's "entanglement" (the term employed by most courts) sufficiently, indicating that if squarely faced with the issue, it might well permit findings of liability for analyst statements and adopt the majority test. *Id.* at 73–74.

Courts concluding that an issuer may be liable under the statute for failure to correct an analyst statement have generally required that the plaintiff allege that: (1) the issuer "entangled" itself in the making of a statement by the analyst; (2) the issuer knew that the statement (commonly a prediction) was false or lacked a reasonable factual basis when made; and (3) the issuer failed to disclose the falsity or the unreasonableness to investors. *See, e.g., In re Caere Corp. Sec. Litig.*, 837 F.Supp. 1054, 1059 (N.D.Cal.1993). The element of entanglement may be satisfied by the issuer having either "fostered," "induced," or otherwise caused the statement to be made in the first place, or having adopted, ratified, or otherwise "endorsed" the statement after it was made. *See Suna*, 107 F.3d at 72–74. In either instance, the issuer must have "sufficiently entangled itself with the analysts' [statements] to render [them] attributable to it." *Chipcom*, slip op. at 2, n. 24 (quotation omitted).[11]

Applying the requirements of Rule 9(b) to the law as described above, a plaintiff is required to allege with particularity the time, place, content, and speaker of the issuer's communications with the analysts, and explain why the communications were fraudulent. *See Suna*, 107 F.3d at 73; *Colby*, 817 F.Supp. at 210, 213–15. The allegations of entanglement may not be "merely casual or speculative." *Schaffer*, 924 F.Supp. at 1310. As with any claim of fraud in the securities context, the plaintiff relying on an analyst statement must allege facts giving rise to a "strong" inference of fraudulent intent. *Suna*, 107 F.3d at 68.

## III. Analysis

The parties disagree strongly as to the proper mode of analysis in a 10b–5 case. Plaintiffs make much of some courts' description of the requisite analysis as "contextual." As a generality, this is, of course, correct. The dispute here, however, appears to be as to the breadth of the context considered. Plaintiffs argue that the requisite contextual analysis is so broad that the Court must consider each statement in context with each of the 19 others. They are incorrect.

Case after 10b–5 case has been decided by a statement-by-statement analysis in which the inquiry made is restricted to the immediate context of each statement—namely, the balance of what was said on the particular occasion, and the immediate circumstances in which the particular statement was made. Indeed, the First Circuit in *Capri Optics*, noting that statements must be understood "in the context in which they are made," considered what "[a]ny investor knew in mid-January" (the time of the statement) about a recent market event, and then proceeded with distinct, independent evaluations of the various pairings of statement and omission raised in the Complaint. 950 F.2d at 11. The Court in Shaw analyzed each of three statements without regard to the other two, despite the fact that the contents of the three were virtually identical. 82 F.3d at 1219–21. *See also Shapiro v. UJB Fin. Corp.*, 964 F.2d 272, 284 (3d Cir.) ("[10b–5]

---

**11.** In this case, only the "fostering" or "inducement" form of entanglement is alleged.

allegations [must be organized] into discrete units that are, standing alone, each capable of evaluation"), cert. denied, 506 U.S. 934, 113 S.Ct. 365, 121 L.Ed.2d 278 (1992).[12] It is not the law that a 10b–5 complaint is to be judged on the basis of the general flavor derived from an issuer's collective statements over a long period of time.

In addition to requiring a statement-by-statement analysis, the First Circuit has directed that consideration of the dismissal of a 10b–5 case be "meticulous and well articulated." See Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170, 176 (1st Cir. 1994). This has made for a daunting task in the case at hand. There are 20 "statements" at issue, the majority of which consist of multiple announcements or comments. These in turn are most often unrelated to each other, and therefore require quite individualized attention.[13]

To condense the analysis somewhat, it is helpful to flush out and address at the outset the sufficiency of several allegations asserted by plaintiffs to apply to many of the statements.

### A. Generally Applicable Allegations of Omission

Although at first blush it appears, as defendants contend with respect to a majority of the statements at issue, that plaintiffs fail to identify what information should have been disclosed and why, nevertheless a careful read establishes that the Complaint does in fact allege some materially misleading omission with respect to every statement. Albeit in a disjointed fashion, plaintiffs assert a series of allegations of omission said to apply to "[all] statements made by defendants during the Class Period,"[14] see Compl. ¶ 43, and "[all] Defendants' representations set forth [in the Complaint]," see Compl. ¶ 75.

The generally applicable charges of omission are of the following facts:

(1) BT's "relationship with its most important customer, Bell Atlantic, was materially changing;"[15]

(2) BT "had been unable to solve significant technological problems with ... the Access Np®, ... and that these ["bugs"] were [preventing], and would continue to prevent widespread commercial acceptance of the system," and "were causing [BT's] customers to withhold purchase approval, thus preventing [BT] from converting orders into sales," and that, as a result, "there would be no significant upside to [BT's] revenues and earnings based on the introduction of [the] various new product developments and strategic alliances [which had been] announced during the Class Period;"

(3) as BT's international sales "increased as a percentage of [its] total sales, the

---

12. Plaintiffs' reliance on Lucia v. Prospect St. High Income Portfolio, Inc., 36 F.3d 170 (1st Cir.1994), for their argument as to context is misplaced. The Court's discussion there—of the requisite inquiry being into the "manner of presentation" and the "emphasis and gloss" of each statement—actually supports defendants' position.

13. To complicate matters, the Complaint here is organized in a manner that has hindered swift adjudication. Allegations that ultimately are clearly intended to relate to one another are strewn about the Complaint in such a way that their relatedness is apparent only after repeated review of the over fifty page pleading. As is evident below, plaintiffs have employed a confusing variety of approaches to when and where they assert their allegations of omission—the result being a tedious search by the Court for the applicable charge. As the First Circuit stated in Capri Optics, "[the] burden [of matching statement with omission] should not be [the Court's]." 950 F.2d at 8.

14. These are Statements 3 through 20.

15. The specific facts about Bell which BT is charged with knowing and failing to reveal are the following: (a) "[BT] had already sold [Bell] more products and services than was warranted by [Bell's] then current needs;" (b) Bell "would not make purchases of existing products at anywhere near the levels experienced over the last few years;" (c) Bell "was not obligated to buy the equipment in use in the Maryland "T–Mail" trial until [it] accepted the products;" (d) Bell "was seeking extended payment terms for any new purchases it made from [BT];" (e) "although [Bell] was considering investing in the next generation of voice and information processing systems then in development, it was actively soliciting proposals from [BT's] primary rivals in the industry;" and (f) such solicitation was due to BT's "product offerings [being] limited in scope and inadequate to meet [Bell's] anticipated needs for the future."

factors characteristic of its international business, such as a longer sales cycle, extended payment terms and the installation of smaller systems with lower margins would have a material negative impact on the company's future revenues and earnings;" and

(4) "weakness in demand for [BT's] products was slowing sales and shipments." [16] (Compl. ¶¶ 43–45, 75.)

As discussed above, scrutiny under Rule 9(b) in the securities context is "especially strict" in the First Circuit. *See Gross*, 93 F.3d at 991. The Rule requires that a 10b–5 plaintiff not only allege specific facts supporting the claim that the statements at issue were false or misleading (e.g., facts as to poor market conditions, increasing competition, declining customer needs, or negative events in business operations), but also specific facts from which defendants' knowledge of those events or conditions can reasonably be inferred. *Greenstone*, 975 F.2d at 25. As the Court asked in *Tapogna v. Egan*, 141 F.R.D. 370, 377 (D.Mass.1992), when dismissing a 10b–5 claim pursuant to Rule 9(b):

> What is the source of this [negative] information? What is the reason for believing that it is true? What is the factual basis for stating that, if true, the defendants both knew of this information and knew it to be true at the time they made the statements?

A complaint which fails to address these questions with particularized factual allegations is not sufficient.

The Complaint here is somewhat of a mixed bag with respect to the first of these categories (concerning the very occurrence of the negative events or conditions). Occasionally, depending on the nature of the statement made, plaintiffs' allegation of "bad news" is sufficiently particular to preclude, at least at this stage of the litigation, a determination that the news was inherently or otherwise completely irrelevant to the statement.

Plaintiffs' allegations of defendants' *knowledge* of the bad news, however, are a different story. As to every piece of alleged bad news in the case, plaintiffs fail to assert any facts as to defendants' knowledge of that news. In the First Circuit, "general averments of defendants' knowledge of material falsity [do] not suffice." *Gross*, 93 F.3d at 991. A 10b–5 plaintiff must allege "details of [defendants'] alleged fraudulent involvement," including specifics as to what defendants had knowledge of and when. *Id.* To satisfy this requirement, complaints typically [17] identify internal reports, memoranda, or the like, and allege both the contents of those documents and defendants' possession of them at the relevant time. *See, e.g., Serabian*, 24 F.3d at 368 (plaintiffs, "cit[ing] to reports and documents presented to defendants at relevant times that were inconsistent with the defendants' public statements ... satisfies the necessary pleading requirements." Moreover, such citation must be "specifically" made). *Id.* Recently, in *Shaw*, the Court ruled that merely alleging the existence of a highly efficient reporting sys-

---

16. There are two additional allegations of omission which are asserted alongside the generally applicable ones. Each, however, bears an arguable relation to only one of the 20 statements. These omissions are of the following alleged facts:

> [BT's] promotional sales tactics and channel stuffing to artificially hype sales and the apparent trend of revenues and earnings was no longer sufficient to mask the fact that the fundamentals of the business were weakening, [and]
> the decline in earnings [BT] reported in the second quarter was not a temporary 'hiccup' and reversible, but was, in actuality, the beginning of a long-term downturn.

Plaintiffs' complaints as to the non-disclosure of these facts are addressed below. *See* discussions of Statements 4 and 16, respectively. The Com-

plaint also includes the following allegation of omission, said to be generally applicable:

> [T]he analysts' estimates of growth in the third quarter, cultivated and caused by defendants, were misleading to investors because, as defendants were aware, at all relevant times, such estimates lacked a reasonable basis.

Apart from the fact that this allegation is merely conclusory, it has no relevance to any but the six analyst statements.

17. There are, of course, other ways to prove knowledge. One can imagine a complaint alleging, for example, the contents of statements by an issuer revealing that knowledge, or the occurrence of a meeting at which the relevant subject matter was discussed. Regardless, however, of the possibilities, plaintiffs here fail to assert any facts going to knowledge.

tem—even one that would logically lead to internal reports on the relevant subject matter—was not enough. The Court wrote that such allegations "may speak to the question of *how* defendants might have known what they allegedly knew, but [they are insufficient] absent some indication of the specific factual *content* of any single report generated by the alleged reporting system." 82 F.3d at 1224 & n. 38 (emphasis in original). Defendants argue that such "content" allegations are plainly absent in this case. They are correct. Not a single report, memorandum, meeting minute, or like item is referred to or specified in the Complaint.

 In the circumstances, plaintiffs rely heavily on the fact that the individual defendants sold, cumulatively, over 300,000 shares of BT stock during the proposed class period. However, "the mere fact that insider stock sales occurred does not suffice to establish scienter." *Shaw*, 82 F.3d at 1224. While some courts have found that stock sales can support an inference of fraud, they have generally required plaintiffs to allege facts establishing that the trading was out of the ordinary. See, *e.g., Greenstone*, 975 F.2d at 27 (insider trading "in suspicious amounts or at suspicious times, of course, could help [a 10b–5 plaintiff]"). *See also Chipcom*, slip op. at 36 (noting that plaintiffs' failure to plead the amount of trading normally conducted by the individual defendants precluded necessary comparisons) (and cases cited therein). While perhaps the timing of the sales warrants consideration, plaintiffs have not asserted any facts as to amounts normally traded from which it would be reasonable to infer that the defendants' actions were out of the ordinary. In any event, insider trading alone cannot carry the day.

The story is no different when it comes to the Complaint's miscellaneous other allegations of fraud—that is, those which are asserted with respect only to certain statements. Indeed, the vast majority of these "individualized" allegations of omitted fact are mere reformulations of the generally applicable allegations identified above. Even where the bad news at issue does vary somewhat, the lack of facts going to knowledge remains a problem. In the end, the entire Complaint rests on an assumption that defendants "must have known of the severity of their problems earlier because conditions became so bad later on." *Serabian*, 24 F.3d at 367. Such pleading of "fraud by hindsight" is insufficient under Rule 9(b). *Gross*, 93 F.3d at 991. As is merely "adamantly contend[ing] that [a public] statement is false." *Id.* at 993.

### B. *Allegations of Entanglement*

 As discussed above, six of the 20 statements at issue were made by independent industry analysts. To state a claim of fraud on the basis of an analyst statement, a complaint must allege "entanglement," and must, pursuant to Rule 9(b), do so with sufficient particularity. *Suna*, 107 F.3d at 73. In this case, the application of Rule 9(b) to the analyst statements requires that plaintiffs specify the time, place, speaker, and content of what was said to the firms by the defendants that would have induced them to make the allegedly misleading comments and forecasts. *Id.* The entanglement allegations here—the majority of which appear to be intended by plaintiffs to apply to all six analyst statements (and are therefore discussed in advance of the statement-by-statement analysis below)[18]—fail the test of Rule 9(b).

Plaintiffs assert first that defendants "*used communications* with securities analysts to promote the Company and to inflate artificially the price of [BT] stock during the Class Period." (emphasis supplied). This is a fruitless combination of an allegation of unspecified communications between unidentified persons and a conclusory charge as to motive. It is completely devoid of detail as to what was said in what context.[19] The same observations apply to the allegations that:

18. With three of the six, plaintiffs supplement the generally applicable allegations with allegations particular to the individual statement. For simplicity's sake, these are addressed below in the discussion on the merits.

19. The Complaint actually refers the reader to some further description of the communications, but this promise goes unfulfilled. No particulars are ever alleged.

Defendants knew that by *participating in regular, direct communications* with analysts, [BT] could disseminate information to the investment community and that investors would rely and act upon such information.... Defendants *communicated with analysts* in order to cause or encourage them to issue favorable reports concerning [BT].

(emphasis supplied).

Similarly, plaintiffs allege that defendants "*repeatedly assured* [analysts, including those whose reports are raised in this case] that [BT's] business was strong and the Company was on track to achieve the strong earnings and earnings growth that the analysts, *with the defendants' guidance,* had estimated." (emphasis supplied). Without particulars on the making of such assurances or the provision of such guidance, this allegation is insufficient under Rule 9(b).

The allegation that "it was [BT's] practice to have its top officers and key members of its management team *communicate regularly* with securities analysts ... *to provide detailed 'guidance'* to these analysts," (emphasis supplied), fails to satisfy the requirements of Rule 9(b). That plaintiffs here go on to allege that these communications "included, but were not limited to, conference calls, meetings, and analyst briefings where the defendants discussed relevant aspects of [BT's] operations and financial prospects," *id.,* is not good enough. The identification of several settings—all of which are used by business people to communicate every day—in which otherwise wholly unspecified communications are alleged to have taken place offers nothing more than an allegation of communication in general. In sum, none of the several generally applicable allegations of entanglement are pled with the particularity needed to sustain the analyst statement claims.

### C. *Rule 12(b)(6)*

*Statement 1*

▮ On or about May 1, 1995, BT filed with the SEC a Form 10–K covering the fiscal year ending January 31, 1995. The Complaint alleges that BT, in the 10–K:

stated that a new enhanced services platform, based on its CO ACCESS® Network Services Platform, developed under contract with the Nippon Telegraph & Telephone Corporation ("NTT"), would be deployed during the late summer of fiscal 1996 (corresponding to calendar year 1995); [and]

also acknowledged the relative importance of its sales to the Regional Bell Operating Companies ("RBOCs"), especially Bell Atlantic. The Company stated that Bell Atlantic accounted for an increasing percentage of its sales from 42% in fiscal 1993 to 44% in fiscal 1994 and 48% in fiscal 1995. The Company also stated that no other single customer accounted for more than 10% of its sales in fiscal 1995.

Plaintiffs' specific complaint as to the platform deployment announcement is that it obligated defendants to disclose their alleged knowledge of "technological problems with the ... new products." The Bell Atlantic comments are said to have raised a duty to disclose that the volume of business between the two companies had started and would continue to decline.

The deployment announcement is not actionable. In the first place, it consists of a report of a past event (the joint development effort), and a forward-looking statement about an anticipated event (summer deployment). Plaintiffs do not dispute that BT did in fact develop the platform with NTT, and accurate reports of past results or events are not actionable. *See Serabian,* 24 F.3d at 361. Nor are forward-looking statements in required SEC filings actionable, as long they are made in good faith and with a reasonable basis. 17 C.F.R. § 240.3b–6; *Arazie v. Mullane,* 2 F.3d 1456, 1465–68 (7th Cir.1993). The Complaint does not allege either bad faith, or any facts from which a lack of reasonableness can be inferred. Moreover, the announcement neither inherently concerned, nor implicitly referred to the quality or condition of the product line. It would not be reasonable to conclude from such an announcement that no development problems were being met.

 Nor are the comments relating to Bell Atlantic actionable. They did not contain any reference to or suggestion about the future. They were strictly concerned with past results, and are not alleged to have been false. Accurate reports of past success are not actionable. *Serabian*, 24 F.3d at 361. To the extent that the "relative importance" remark may have implicated the current or future status of the relationship with Bell, it was too vague to be material.[20]

*Statement 2*

 BT's Annual Report to Shareholders for fiscal year 1995, issued at the same time as the 10–K, stated that:

> [m]anagement believe[d] that the North American and International businesses [would] experience the same rate of growth [experienced in 1995] in fiscal 1996.

The Report also noted that fiscal 1995 rates of growth for North American and international revenues were, respectively, 6% and 111% over the prior year.

Plaintiffs complain here that the prediction "conditioned the market to expect that [BT's] growth would continue," at a time when defendants knew or recklessly disregarded that: (1) North American sales "were materially slowing and by the end of the fiscal year would all but vanish," and (2) "technological problems with [BT's] new products [existed and] were preventing commercial acceptance on a scale sufficient to sustain the Company's past growth rates, and thus could not be counted on to make up for lost sales of existing products." Their arguments have merit.

Predicting specific levels of growth rate may be actionable under Rule 10b–5. Defendants argue that the statement is merely loose optimism about the future, but in *Priest v. Zayre Corp.*, the Court wrote that:

> Optimistic, vague projections of future success which prove to be ill-founded are not,

without more, sufficiently material to incur ... liability. When, however, such projections are accompanied by either specific qualifications of projected results implying certainty (*e.g., earnings shall increase by at least 30% next year*) ..., then such statements can be the basis of Rule 10b–5 liability.

1987 WL 10741, at *2 (D.Mass. May 1, 1987) (emphasis supplied). *See also Colby*, 817 F.Supp. at 211 (court contrasts Priest prediction to what it called a "vague 'bright prospects' comment [that] offers no projections of earnings or sales statistics," noting that "empirical data [such as percentage figures] have been crucial in cases findings forecasts material."). The prediction here is not a vague statement of hope; it contains a specific and concrete projection for the future. *Compare Elkind v. Liggett & Myers, Inc.*, 635 F.2d 156, 164 (2d Cir.1980) (affirming dismissal of claim based on statement that "we expect another good year in 1972"); *Simon v. American Power Conversion Corp.*, 945 F.Supp. 416, 428–29 (D.R.I.1996) (expectation that "1995 [is going] to be a busy year" immaterial sales talk).

Nevertheless, defendants are shielded from liability on the basis of Statement 2 by way of the "bespeaks caution" doctrine. Almost immediately following the prediction, the Annual Report stated, under the heading "Future Operating Results:"

> The Company's future operating results may vary from period to period. The Company has operated historically with minimal backlog; as a result, revenues in any quarter are dependent on orders booked, built, and shipped in that quarter. In addition, the Company has experienced a pattern of recording the majority of its quarterly revenues in the third month of the quarter. Moreover, the Company has relatively few customers and a high average system revenue per transaction. Meanwhile, the Company's operating ex-

---

20. Moreover, there is no duty to state the obvious. *See In re Donald J. Trump Casino Sec. Litig.*, 7 F.3d 357, 377 (3d Cir.1993), *cert. denied*, 510 U.S. 1178, 114 S.Ct. 1219, 127 L.Ed.2d 565 (1994). Surely the reasonable investor recognizes that having all of one's eggs in a single basket, particularly in a high stakes business environment, is risky. In other words, the announcement of Bell's primacy in BT's business need not have been taken as purely good news—there are inherent problems with having one very large customer which the reasonable investor can be expected to understand.

penses are incurred ratably throughout each quarter and are relatively fixed in the short term. As a result, if projected revenues are not realized in the expected period, the Company's operating results for that period could be adversely affected. The Company's revenue stream depends on its ability to enhance its existing software products and to introduce new products on a timely and cost-effective basis. If the Company were to delay the introduction of new products, the Company's operating results could be adversely affected.

Certain components of the Company's products are currently available from a single source and any interruption in the supply of such components could adversely affect the Company's operating results.

These cautionary words are sufficiently strong in both tone and substance to counter whatever significance investors might reasonably attach to the prediction. They are directly relevant the subject of the prediction, and highlight repeatedly and in a straightforward manner several concrete reasons for recognizing forecasts as to BT's future to be uncertain.

*Statement 3*

Plaintiffs complain about several different portions of a press release issued by BT on May 17, 1995, claiming that they cumulatively "generated greatly increased volume in trading of [BT] stock and a rapid rise in the company's stock price." The challenged portions read as follows:

[A] [The Company reports] net income of $3,278,000 on revenues of $26,021,000 for the quarter ended April 30, 1995. These results represented a 45% increase over net income of $2,266,000 for the first quarter for fiscal 1995, and an increase of 42% over revenues for that same period. Net income per share for the first quarter of fiscal year 1996 was $.13 compared to $.09 for the same period in fiscal year 1995.

[B] This quarter, Bell Atlantic, our largest customer, began an innovative trial deployment of T–Mail (SM) Telephone Mail Service to 400,000 households in Montgomery County, Maryland. This is the world's first consumer messaging trial of this mag-

nitude. BT is extremely pleased to have been chosen as Bell's technology partner for this service.

[C] At the same time we continued our expansion in the Asia/Pacific region with our new contract from Telekom Malaysia and strong revenues from our existing customers in Japan.

As to this material, plaintiffs' complaint appears to rest on the four generally applicable allegations of omission discussed above. As to paragraph B in particular, the claim is that the release "heralded the beginning of a new relationship with ... Bell Atlantic," and thereby fostered the false impression that: (1) business relations between BT and Bell Atlantic were "increasing rather than decreasing," and (2) BT "would continue to grow consistent with defendant's earlier projections," referring, presumably, to projections made in the 1995 Annual Report.

 Irrespective of the charged omission, the announcement of earnings for the preceding quarter is no basis for 10b–5 liability. The announcement is not alleged to have been false, and it strictly concerned the past. It is therefore not actionable. *See Serabian,* 24 F.3d at 361. An issuer is not obliged, when reporting past financial results, to inform the public that future finances appear less rosy. *Id.*

 Nor is paragraph B actionable, as the comments simply do not touch on the subject of the health and status of BT's overall business with Bell Atlantic in a material way. That Bell's need for BT existing products was lessening bears no logical relation to Bell's embarking on a trial deployment of a new BT product, and BT neither promised nor predicted a particular volume of sales resulting from the trial. Any image that the press release might have evoked of the ball rolling ever-forward in the Bell–BT relationship is far too pale to sustain plaintiffs' claim.

Moreover, issuers are not obliged to disclose the obvious. *Trump,* 7 F.3d at 377. Plaintiffs' complaint is that defendants failed to inform investors that Bell had not yet committed to purchasing the T–Mail service.

A "trial" is, in common parlance, a "test," and the outcome of a test is well understood to be unpredictable.

 Nor is paragraph C vulnerable. Defendants' report of "continued expansion" in the Asia/Pacific region, the new Telekom Malaysia contract, and "strong revenues" in Japan, is not alleged to have been false and was concerned solely with historical fact. Accurate reports of past successes are not actionable. *Serabian*, 24 F.3d at 361. Plaintiffs argue that the report was not in fact limited to the past. To the extent, however, that BT's then-current state of affairs might have been implicated, the statements made were not rendered misleading by omission. The sole omission raised by plaintiffs bearing an arguable relation to paragraph C is of the fact that increasing reliance on foreign sales would negatively impact accounts receivable and marginal returns. This proposition is, however, too remote to sustain a claim, particularly since the report of new business made no suggestion, promise, or prediction at all as to what that expansion would mean for the bottom line.

Plaintiffs ultimately characterize the press release as having "fostered an impression" that BT "would continue to grow consistent with defendants' earlier projections." The characterization is inaccurate. Neither a portion nor the whole of the release is reasonably read as a reiteration of an earlier growth projection. In sum, no portion of Statement 3 provides a valid basis for plaintiffs' 10b–5 claim.

*Statement 4*

On May 17, 1995, C.E.O. Taylor held a conference call with industry analysts in which he made two representations now at issue. First, in the words of the plaintiffs, Taylor

> attributed [BT's] $0.01 per share slip from the consensus estimates ... to "$1.3 million in research-and-development expense, connected with the NTT contract" to develop the Access NP® line of products.

In this instance, plaintiffs complain about Taylor's omission of the following facts: (1) BT had been unable "to solve significant technological problems with [the Access NP®];" (2) if never resolved, these problems "would continue to prevent widespread commercial acceptance of the system;" and (3) international sales cycles commonly presented some negatives in terms of revenue collection.

Second, Taylor said, in reference to a 4.3% rise that day in the price of BT shares, "[t]he fundamentals of the Company are fine, and I think [Wall] Street responded to that." The plaintiffs' claim that with this, defendants wrongfully "emphasized positive themes and suppressed negative information." The allegation is taken to incorporate all of the four generally applicable allegations of omission discussed above (namely, the decline of Bell business, debugging problems with the Access NP®, the negative effects of increasing international business, and weakness in demand for BT's products). Plaintiffs further assert that defendants culpably failed to inform investors that the fundamentals of BT's business "were weakening," and that defendants' "promotional sales tactics and channel stuffing to artificially hype sales and the apparent trend of revenues and earnings was no longer sufficient to mask [that] fact."

 Statement 4 is not actionable. The first portion—defendants' employment of the R & D expense to explain a decline in stock value—was in no way a representation that the R & D process had been, or was expected to be, problem-free. Mention of the $1.3 million expense had nothing inherent to do with either the actual status of the development effort, or the technological merit of the new product line, and therefore did not obligate defendants to discuss whatever obstacles might have been encountered in that effort. Nor did the comment bear any logical connection to the subject of international sales cycles.

Plaintiffs' further contention that Taylor's statement was misleading because it failed to explain that unresolved bugs in the new product would prevent its commercial acceptance of that product is unpersuasive. As defendants were not obliged to disclose the allegedly unresolved bugs in the first place, it follows that they were not obligated to discuss the fact that such bugs could cause

marketing problems. Moreover, the fact that a new product might face problems in the market is obvious to a reasonable investor, and therefore omission of it is not culpable. *See Trump,* 7 F.3d at 377 (no violation in "failing to alert investors to the obvious implications [associated with] weakened economic conditions in the Northeast").

 Nor is the "fundamentals are fine" statement actionable. While the remark may indeed have "emphasized positive themes and suppressed negative information," it is vague in meaning and general— too general for a reasonable investor to take into account when making an investment decision. Indeed, it is precisely the kind of "rosy affirmation commonly heard from corporate managers and numbingly familiar to the marketplace" that the First Circuit has concluded is not actionable under the securities laws. *See Shaw,* 82 F.3d at 1217; *Colby,* 817 F.Supp. at 210–11 ("long-term prospects are bright" not actionable).

*Statement 5*

On May 18, 1995, industry analysts at Merrill Lynch Capital Markets ("Merrill") issued a report on BT. The report contained the following comments under the heading "Business Trends:"

[A] [BT's] international revenues increased by 15% to $14.8 million from $12.9 million in the preceding quarter. The Pacific Rim continues to be the main driver of growth. For example, the company recently announced a $5 million contract with Telekom Malaysia.

[B] The increase in international revenues has impacted accounts receivable. However, management indicated that the quality of receivables was very high, and we expect DSOs [days sales outstanding] to decline going forward.

[C] North American revenues in the April quarter declined sequentially by 140% to $11.2 million. However, the company recently announced a trial with Bell Atlantic that could significantly increase voice messaging penetration in that area.

[D] Management announced that NTT had accepted the company's new hardware and software platforms, and that its contract with NTT was completed on April 26. Management indicated that NTT would contribute revenues of about $4–5 million in fiscal 1996.

[E] Gross margins included about $1.3 million in cost overruns for NTT. Excluding this charge, gross margins would have been 68.6%.

 As an initial point, the defendants cannot be held responsible for this statement because the allegations of entanglement are insufficient as a matter of law. As with the generally applicable allegations of entanglement discussed above, that asserted with specific respect to Statement 5 is insufficiently particular. The Complaint describes the Merrill report as "reflecting defendants' entanglement with analysts," but fails to provide any specifics in support of such a contention. Such a general, conclusory allegation fails the test of Rule 9(b). *See Suna,* 107 F.3d at 73–74.

 Regardless, defendants' failure to "correct" the Merrill report, does not, as a matter of law, provide a valid basis for 10b–5 liability. Even if defendants had themselves issued the report, it would not be actionable. As falsity is not alleged and plaintiffs make no allegations of omission particular to Statement 5, its multiple components are considered in light of the four generally applicable allegations discussed above.

Paragraphs A and B, read, logically, in conjunction, did not, as plaintiffs contend, obligate defendants to discuss the negative effects of increased foreign sales. To the extent that the remarks are accurate reports of the past, they are not actionable. Where they provide notice of expansion and announce a new foreign contract, they do not implicate the subject of the repercussions of foreign sales rising as a percentage of total business, and therefore did not obligate defendants to speak on the subject. Moreover, paragraph B itself, with its disclosure that "[t]he increase in international revenues has impacted accounts receivable," satisfied whatever duty might have arisen.

Paragraph C is an innocuous combination of: (1) a commendable report of a decline in

North American revenue figures—not actionable as an accurate report of past results—and (2) a reiteration of the fact of Bell Atlantic's "trial" of T–Mail. As explained above with respect to Statement 3, reporting on the narrow subject of the T–Mail trial deployment did not obligate defendants to disclose the decline of BT's overall business with Bell. Likewise, Merrill's comment that the trial "could" significantly increase voice messaging penetration in North America would not be actionable even if it had been made by the defendants themselves. Claims that such vaguely optimistic statements about marketing and sales prospects violate Rule 10b–5 are routinely dismissed. *See Glassman*, 90 F.3d at 635–36 ("[we expect new product] to broaden the number of customers in existing accounts as well as attract new customers") (and cases cited therein).

Nor are paragraphs D and E of Merrill's report actionable. Paragraph D consists of an accurate report of past events, and a revenue prediction not alleged to have been made in bad faith. While the $4–5 million prediction is perhaps specific enough to raise the spectre of actionability, plaintiffs do not allege facts from which the lack of a reasonable basis for the prediction could be inferred. Paragraph E is a non-actionable report of past financial results.

*Statement 6*

The Complaint next alleges that:

[O]n May 18, 1995, the securities firm Furman Selz Inc. disseminated a report on [BT] "reinstating" the Company to its "recommended list." The report highlighted the expectation generated by [BT] of "several major announcements over the next two months regarding new customers both in this country and internationally" and provid[ed] estimates for earnings by the Company of $0.19 per share in the third quarter of the fiscal year, ending October, 1995.

The alleged wrongdoing complained of here is that defendant Taylor "emphasized positive themes and suppressed negative information." As in the case of Statement 5, this is taken as a charge that Furman's report obligated BT to make one or more of the four disclosures assumed to apply to every statement at issue.

■ Prior to addressing the merits of plaintiffs' claim, it should be noted that with respect to Furman's report, the Complaint includes an allegation of entanglement which supplements the generally applicable allegations dismissed as insufficient above. The report is said to have highlighted expectations "generated by" BT. The Complaint offers, however, no facts as to any particular communication between Furman and any of the defendants in which the otherwise unspecified expectations might have been "generated." Thus, the requirements of Rule 9(b) remain unmet.

■ As to the merits, a "recommended" or "buy" rating is not actionable because opinions generally do not provide a sufficient basis for 10b–5 liability, *Wright v. International Bus. Mach. Corp.*, 796 F.Supp. 1120 (N.D.Ill.1992), and the recommendation in any event was not that of the defendants. A recommendation or rating by an independent securities firm is the purest of opinions. Moreover, it seems unlikely that in the making of a ratings determination, Furman's practice would have been to consider only what it was told by the issuer. Plaintiffs have failed to allege any facts about the process by which the firm made such determinations, and it would be unreasonable to infer that there were not in fact other considerations in the mix. The same reasoning applies to preclude the claim based on Furman's $.19 per share earnings estimate from going forward.

■ Nor is the "several major announcements" prediction a valid basis for relief. It is not alleged to have been false, and the Complaint alleges no facts from which unreasonableness can be inferred. None of the four charged omissions is inherently related to or inconsistent with an expectation of new customers.

*Statement 7*

■ The Complaint next attacks an announcement of May 30, 1995, in which BT reported that it had reached an agreement with McCaw Cellular Communications, Inc.

("McCaw") to begin the testing of certain BT products on that company's wireless network.[21] The announcement also included a comment by C.E.O. Taylor that:

> The wireless marketplace is the fastest growing segment of the telecommunications market worldwide. [BT] is highly focused on providing enhanced services specifically for the needs of the wireless service operators.

Plaintiffs do not allege that the announcement was false. Rather, they charge defendants with actual or constructive knowledge of "the serious weakness in [BT's] domestic sales [that was] due to increasing competitive pressures and its deteriorating relationships with its major customers," and argue that concealment of this information rendered Statement 7 misleading.

Neither portion of the report is actionable. The McCaw remark is not alleged to have been false, and it concerned the narrow, historical fact of the execution of an agreement. It bears no inherent or logical relation to either the level of competition BT faced, or any weakness in overall domestic sales which the company might have been experiencing. Omission of these facts did not render the remark misleading.

Nor did defendants have a duty to specify that McCaw had not committed to purchase BT's products. Nothing in the statement suggested that McCaw was so committed. Plaintiffs' challenge to defendants having announced the Bell Atlantic trial without explaining that there had been no commitment to buy is rejected above, and the claim here fails as a matter of law for the same reasons.

 The "wireless market" and "highly focused" comments are not actionable because they bear no inherent or logical relation to any of the facts BT is charged with failing to disclose—softness in domestic sales, increased competition, the impact of increasing foreign business, and a decline in prospects for the Bell relationship. They report strictly on the subjects of the growth of a marketplace in general and BT's "focus" on developing good products for that marketplace. The comments at most add up to a shot of puffery. *See Glassman,* 90 F.3d at 635–36 (statements that "[we] expect our new product] to broaden the number of customers in existing accounts as well as attract new customers" not actionable) (and cases cited therein); *Simon,* 945 F.Supp. at 428 (statement recognizing "significance of newly emerging international markets and the vast potential for [defendant's] products in these areas of the world" was "little more than corporate cheerleading").

## Statement 8

 In a press release of May 30, 1995, BT announced that it had executed a $2 million contract with a Chinese telecommunications provider. Plaintiffs complain that the announcement was incomplete and misleading because BT "failed to acknowledge that the extended sales cycle typical of its foreign sales and marketing would delay the recognition of revenue from their increasingly important foreign customers, and as a result, have a negative impact on the Company's earnings."

There is no merit to this claim. A report of a new foreign contract does not require explanation of the facts that increasing foreign sales as a percentage of one's business may have some negative consequences. *See* discussion of Statement 3 (Telekom Malasia contract). The text of Statement 8 could not reasonably be taken as a prediction—let alone a definitive one—of the contract's potential impact on BT's bottom line. Indeed, the statement contained no mention either of the timing of sales or revenue collection on the contract, or the percentage of BT's total sales represented by the contract. The Chinese contract announcement did not, as plaintiffs argue, put "in play" the subjects of the charged omission, and it therefore was not misleading by virtue of that omission.

---

21. It is unclear whether the details of the McCaw agreement—namely, that the "acceptance testing" arrangement allowed the use of BT's products without obligation until McCaw "accepted" the products for purchase, and that the testing was expected to be completed by year end—are alleged to have been announced by the defendants. For purposes of this decision, it is presumed that plaintiffs intend to make such allegations. In any event, the result is the same.

*Statement 9*

According to plaintiffs:

On June 6, 1995, the firm of Furman Selz, Inc. disseminated an analyst report recommending [BT's] stock as a "BUY" and noting that the Company had alerted the investment community of its anticipated new product announcement scheduled for June 20, 1995. The report also emphasized the importance of the agreement with McCaw and its potential for [BT]. The analyst also noted that [BT] would participate in a conference sponsored by Furman Selz the next day.

As a threshold matter, the Complaint contains no allegations of inducement, ratification, or other entanglement specific to the making of this statement. It relies solely on those generally applicable allegations of entanglement found insufficient above pursuant to Rule 9(b).

Plaintiffs' charge fails on the merits. The "buy" rating is not actionable for the reasons stated above with regard to the earlier Furman recommendation (Statement 6). Nor is the reported expectation of a new product announcement culpable. Plaintiffs complain of the defendants' failure to disclose "the materially adverse information," asserting, presumably, the four generally applicable allegations of omission. Of these, only the allegation of debugging problems warrants discussion. Furman's report, however, concerns only the timing of a new product's anticipated arrival at market. It does not touch on the status of the design and manufacturing process, and therefore was not misleading when defendants failed to disclose whatever debugging issues might have existed. Moreover, no allegation is made from which either bad faith or unreasonableness can be inferred with respect to this timing prediction. A prediction made in good faith and upon a reasonable factual basis does not violate Rule 10b–5. *Colby*, 817 F.Supp. at 211.

Furman's comment on the "importance of the agreement with McCaw and its

potential for [BT]"—which referred, presumably, to the testing agreement reported in Statement 7—is not actionable. Because mention of the test could not have reasonably been taken as a prediction or promise of favorable results, *see* discussion of Statement 3, it did not obligate defendants to inform the public of uncertainty associated with the agreement. Moreover, the remark is mere puffery. *See Glassman,* 90 F.3d at 635 (dismissing claim based on statement that issuer expected new product "to broaden the number of customers in existing accounts as well as attract new customers"); *Colby,* 817 F.Supp. at 211 ("prospects are bright" immaterial).

*Statement 10*

On June 9, 1995, the firm of Ladenburg, Thalmann & Co. ("Ladenburg") issued a "buy" rating for BT and reported a "growing market, both domestically and internationally, for [BT's] products." As with Statement 9, plaintiffs appear to complain here of a failure to disclose "the material adverse information"—the four generally applicable omissions (the decline in business with Bell, debugging problems with the Access NP®, the repercussions of increasing foreign business, and weakness in demand for BT's products).[22]

Regardless of these various allegations, however, Statement 10 is not actionable. As has been explained, the mere fact of a "buy" rating by a broker is not a sufficient basis for 10b–5 liability of an issuer. Neither does the announcement of a "growing market" for BT's products without further disclosure provide an avenue for relief. Like Statement 7 (the "wireless market is . . . fastest growing"), this comment concerns only the state of the market, and does not relate to, and certainly does not specify, BT's actual capacity to take advantage of opportunities in that market.

*Statement 11*

On June 14, 1995, BT filed with the SEC its Form 10–Q for the fiscal quarter ending

**22.** Plaintiffs assert no additional facts which would supplement the generally applicable entanglement allegations discussed above.

April 30, 1995. The 10–Q reported that "North American revenues were slightly below the previous year's [same] quarter." It also noted "continued expansion" of BT's international sales.

■ Plaintiffs charge that the 10–Q comments were misleading by virtue of defendants' omissions—employing the same duty theory on which the whole rest of the case is based. They also argue that the omissions alleged to be improper were mandated by regulatory law—in particular, SEC Regulation S–K, 17 C.F.R. § 229.303. Section 303 applies to 10–Q filings, and concerns, *inter alia*, issuers' disclosures of "known trends or any known ... events or uncertainties" that are reasonably likely to have a material impact on sales, income, or liquidity. Plaintiffs argue that irrespective of how the duty arose, defendants were obligated to disclose that the company was "experiencing a downward trend in its income," which was "due to problems with its major domestic customers and operational problems with its new products."

■ The contention is without merit. First, there is no private right of action under Section 303 of the regulation. *See Chipcom*, slip op. at 34 n. 28; *Wilensky v. Digital Equip. Corp.*, 903 F.Supp. 173 (D.Mass.1995). In *Wilensky*, the Court rejected the argument that 10b–5 liability may arise from a Section 303 violation, stating that the regulation does not provide for a private right of action. It noted further that "[t]he very relevance of an Item 303 violation to a 10b–5 suit remains subject to some dispute." *Id.* at 181 & n. 10.

Second, no part of the 10–Q raised by the Complaint was misleading due to the charged omissions. Plaintiffs contend that the reference to North American revenues obligated defendants to disclose the existence of an alleged impending decline and the factors behind it. They are incorrect. The comment, which concerned only past financial results, is not alleged to have been false. Accurate reports of historical fact are not actionable—even where future prospects or current conditions are less favorable. *Gross*, 93 F.3d at 992 (a company's "affirmative true statement about past results does not give

rise to a duty to comment on its current status"); *Serabian*, 24 F.3d at 361 (defendants "may not be held liable under the securities laws for accurate reports of past successes, even if present circumstances are less rosy").

*Statement 12*

■ On June 20, 1995, BT issued a press release which quoted Taylor as saying:

[A] Our fundamental objective as a company is to give our customers the most advanced and complete solution for the creation and delivery of enhanced services. With the power of the Access NP® platform and the flexibility of our new object-oriented software layering, we have done just that.

The release also reported that:

[B] [T]he new platform was ... being tested by leading network service providers worldwide and ... shipments would begin in the third quarter of calendar 1995.

Plaintiffs object to the press release's having "touted [the new products] as enhancing the existing voice processing product line." They present a grab bag of complaints about Statement 12 all having to do with defendants' failure to disclose negative information about BT. The specifics of the charged omissions are, however, irrelevant, because the release was nothing more than puffery. First, paragraph A above is precisely the sort of statement that is routinely dismissed as immaterially loose corporate optimism. *See* discussion of Statement 7. And, for the same reasons that other reports of the testing of BT's products have been deemed non-actionable, it cannot be said that the first part of paragraph B obligated defendants to discuss any of the four generally alleged omissions, or the obvious fact that testing did not mean a commitment to buy. Finally, the Complaint does not allege facts from which it could reasonably be inferred that BT's prediction as to shipment dates were made in bad faith or lacked a reasonable basis in fact.

*Statement 13*

■ The July 10, 1995, edition of *Mass High Tech* quoted defendant Burke as having stated:

[W]e think [the new product line] will position us to do a lot of new services. It will open up a lot of doors for us. . . .

[BT is] the only company that is 100 percent focused on the telecom market.

Plaintiffs claim that this statement culpably withheld from investors the information that: (1) BT "was finding it increasingly difficult to close deals for its products, both old and new;" (2) "many customers were delaying any purchases until the results of the acceptance testing were available and [BT] eliminated still existing technological problems;" (3) BT "had been unable to solve the problems that were preventing the products from being widely accepted commercially;" and (4) as a result, BT's growth rate "could not be sustained and, in fact, the company was losing. ground to its competitors."

Statement 13 is not actionable. Burke's new product line comment made no definitive prediction as to the effects of BT being "repositioned," or "doors being opened." In *Glassman,* the First Circuit rejected a claim based on similar statements—that the corporation's new product was expected "to broaden the number of existing accounts as well as attract new customers," and that defendants "believed that [the new product and an existing one were] likely to be used in tandem by major accounts in the foreseeable future." The Court held that:

> These statements, whether read in isolation or in . . . context . . ., suggest, at most, the hope that [the defendant's new product would] eventually gain acceptance in the market. Such a hope is not unusual for a company releasing a new product. . . . [The] statements did not rise to the level of optimism or certainty that would make them materially misleading in the absence of disclosure of initial developmental problems the product was facing.

90 F.3d at 635–36 (citation omitted). Burke's remarks here were as vague in meaning. Also, the telecom market "focus" comment, as alleged (the full statement is not before the Court), relayed neither good nor bad news, and was therefore equally immaterial.

*Statement 14*

 On August 10, 1995, BT announced its earnings for the second quarter of fiscal 1996 (ending July 31, 1995), as well as total revenue, net income, and net income per share for the current and previous fiscal years. In conjunction with the earnings report, Taylor stated:

> [A] With our new product announcement on June 20, we have positioned the Company to participate in significantly broader market opportunities in the future.

> [B] While our revenues and earnings fell short of analysts['] expectations for this quarter, we believe we are seeing softness specifically in North America due to our period of product transition.

> [C] It is significant to note that our international business continues to grow dramatically and represented 74% of our second quarter revenues.

Plaintiffs complain first that the earnings report was misleading because defendants failed to disclose that BT was "unable to convert orders to sales because of the technological problems with the new systems that had been delivered on a trial basis." They argue further, as to all of Statement 14, that defendants were obligated to disclose that: (1) "the terms on which [BT] conducted its business were fundamentally changing in that its growing dependence on . . . foreign sales meant lower margins and extended shipping dates;" (2) "Bell Atlantic . . . continued to defer new orders from [BT] and, at the same time, continued to solicit proposals from [BT's] competitors;" and (3) BT "was undergoing a dramatic weakening of demand for its products."

Plaintiffs are incorrect as to the alleged deficiency in reporting earnings. The issuer of an accurate report of earnings and revenue figures is not required to discuss current or prospective financial conditions. Nor is Taylor's remark about having "positioned [BT] to participate in significantly broader market opportunities in the future" actionable. Like the "opening doors" portion of Statement 13, the remark was no more optimistic or concrete than the defendant's in *Glassman,* 90 F.3d at 635–36.

Taylor's attribution of BT's financial "softness" to its "period of product transition" is similarly immaterial. Reasonable investors would understand the phrase "product transition" to encompass the various problems typically faced by corporations as they change product lines—R & D, marketing, and customer problems. The statement commendably acknowledged—albeit in a vague manner—these problems, which are essentially those charged by plaintiffs as culpably omitted. The only complained of omission not reached by the phrase "product transition" is that of BT's increased dependence on foreign business. The omission, nevertheless, is not implicated by the attribution, as the latter focused on the North American market.

Nor is paragraph C culpable. As in the instances of BT's other foreign expansion reports, defendants had no duty to explain the potential repercussions of expanding foreign sales on revenue collection and earnings. A report of international expansion is not a representation about marginal returns on foreign sales, or shipping or collection dates to do with those sales. Statement 14 could not have been rendered misleading by the challenged omission.

*Statement 15*

On August 10, 1995, BT held a conference call with securities analysts and investors in which a number of items were discussed. According to the Complaint, the defendants:

[A] "highlighted the positive aspects of the quarter, such as the Company's growing international sales, which accounted for 74% of [its] revenues in the quarter, strengthening gross profit margin (68 .8%, nearly 4% above normal), the improvement in [BT's] balance sheet and the initial shipment of the Access NP® Network Services Platform products;

[B] also discussed a $3 million product order cancellation to which it attributed its shortfall in earnings (in comparison to the stated expectations of analysts, which defendants had conditioned); and

[C] stated that the cancellation was not the result of a system malfunction.

Plaintiffs fail to allege any omission particular to these remarks. Presumably they intend to rely on the four generally applicable allegations of omission discussed above.

Regardless, BT's having "highlighted the positive aspects" of its recent business without further disclosure was permissible. None of the financial reporting here (including the strengthening gross profit margin and improved balance sheet remarks) is alleged to have been false. Accurate accounts of past financial results without more are not actionable. As with Statement 14, the growth comment here did not obligate defendants to discuss the revenue or earnings negatives of increased foreign business, as it made no suggestion as to how such growth would impact BT's bottom line. Nor did the mere announcement by BT of its initial Access NP® shipment obligate defendants to any further disclosure. The announcement had nothing inherently to do with the technological merits of the new product, and offered no predictions as to future revenues that might be derived from it. It therefore was not misleading not to discuss "debugging" problems or the market's reluctant acceptance of the product. Finally, none of the other generally applicable omissions raised in the Complaint bore a logical connection to any of the "highlights" discussed.

Nor was defendants, attribution [23] of bad earnings news to the order cancellation actionable. While such a comment may be close to the borderline, nevertheless paragraph B is not reasonably construed to attribute the shortfall to an exclusive cause, and it was therefore immaterial to the investment decision save that it commendably informed investors of a significant order cancellation.

Finally, paragraph C is not actionable. The Complaint fails to allege falsity, and the remark certainly was not misleading by virtue of any of the charged omissions. It concerned only the very narrow subject of a single customer's order cancellation not being the result of a system malfunction.

---

**23.** The defendants do not challenge the accuracy of the report of the conversation.

*Statement 16*

On August 15, 1995, Ladenburg, Thalmann "disseminated a report ... in which it characterized [BT's] problem with a major product cancellation as 'little more than a hiccup.'"

The Complaint asserts two purported "allegations of entanglement" particular to Statement 16. First, plaintiffs allege that Ladenburg's characterization of the cancellation was "based on [BT's] expressions of surprise at this development." This is plainly insufficient under Rule 9(b), as not a single fact as to the context, content, or even the audience of the alleged "expressions" is provided. It is further alleged that Ladenburg's report was among those that "[f]ollow[ed] the Company's earnings announcement," and "reiterat[ed] the positive remarks [of the] defendants." An outside analyst's mere repetition of an issuer's statements—absent allegations of positive steps by the issuer to foster the repetition or ratify it—does not, as a matter of law, constitute entanglement.

The Complaint as to Ladenburg's report fares no better on the merits. It charges defendants with a failure to disclose that: (1) BT's sales in North America "were rapidly diminishing and in danger of disappearing altogether;" (2) BT "was desperately trying to make up the difference with sales in the international market;" and (3) this effort "expose [the company] to longer sales cycles, extended credit terms and lower margin sales." Plaintiffs further assert that BT knew but culpably omitted that "the decline in earnings reported in the second quarter was not a temporary 'hiccup' and reversible, but was, in actuality, the beginning of a long-term downturn."

The "hiccup" comment is not actionable. It amounted to nothing more than a statement that the order cancellation was a one time problem only, which did not require defendants to discuss the state of the company's sales in North America either in general or as compared to the international market.

*Statement 17*

The Complaint next alleges that some time shortly after August 15, 1995:

The firm of Furman Selz, following a conference call with [BT's] management, ... discounted the [single product order cancellation] as a seeming aberration and highlighted its view, based on management guidance, that the Company was expected to achieve earnings in the next quarter of $0.15 per share.

As with Statement 16, the omissions by defendants complained of here concern the following: (1) BT's rapidly diminishing North American sales; (2) the company's attempt to make up the difference in the foreign market; and (3) the resulting sales cycle issues.

As an initial matter, plaintiffs claim to make allegations of entanglement particular to Furman's statement. These are, however, wholly insufficient under Rule 9(b). Alleging that analyst remarks "followed," or were "based on guidance" obtained during, an unspecified conference call simply does not meet this Circuit's criteria.

As to the merits, the "aberration" comment is the functional equivalent of Ladenburg's "hiccup" comment, and non-actionable under the same reasoning. Furman's modification of the comment with the term "seeming" actually rendered Statement 17 even more vague and immaterial than its predecessor. Nor did defendants have an obligation to speak out when Furman issued its earnings prediction. Like the firm's earlier $.19 per share figure, the $.15 earnings per share projection was mere opinion of the analysts. The projection was unaccompanied by allegations as to the factors Furman considered in making such a determination, and it would be unreasonable to infer that the projection was based solely on information provided by BT. *See* discussion of Statement 6.

*Statement 18*

On August 17, 1995, BT announced that its Board of Directors had authorized a repurchase of the company's common stock on the open market or in negotiated transactions. In making this announcement, Taylor stated:

We believe the recent decline in our stock price combined with our strong cash posi-

tion of $31,760,000 at the end of our second quarter of FY 1996 offers us an opportunity to repurchase shares at an attractive price.

Plaintiffs' position here is not at all clear. The statement is not alleged to be false on its face, and, while plaintiffs seem to assert it as a basis for 10b–5 liability, there exists no even arguable relationship between it and any of the omissions of fact raised in the Complaint. Plaintiffs offer no argument as to how this statement might be misleading. That defendants called their cash position "strong" is too imprecise to carry the day.[24] Moreover, the statement as a whole is not even a positive one; it deals with the subject of a stock price decline, which ordinarily is a sign of bad times, not good.

*Statement 19*

 On September 20, 1995, BT announced the introduction of the new Access NP® products into the European market. In making this announcement, Taylor stated:

As technology advances and the way people communicate becomes more sophisticated, exciting new opportunities are being created in the value-added services market. We see tremendous potential for our technologies as we work to help network service providers in Europe provide new services and meet growing competitive pressures. After all, our fundamental objective as a company is giving network service providers, cellular providers, cable companies and other telecommunications providers, the most advanced and complete solution for creating and delivering value-added services. Our customers around the world see us more as a partner than a vendor. That's why we not only provide the best hardware and software, but a total solution including comprehensive marketing support and ongoing assistance.

Plaintiffs' charge here is that Taylor's remarks "falsely emphasiz[ed] that [BT] was purportedly enjoying continuing growth and that its relationships with customers were allegedly strong." As no additional particu-

larized allegations are asserted, the four generally alleged omissions are understood to apply.

The statement mandated no further disclosures. None of Taylor's remarks is sufficiently precise or concrete to be material to the investment decision. His remarks as to the existence of market opportunities and BT's prospects in that market do not support 10b–5 liability. *See Simon,* 945 F.Supp. at 428 ("significance of newly emerging international markets and the vast potential for [our] products" mere puffery). They are not different from the numerous statements on the same subjects that have been discounted above. Nor is Taylor's lauding of the virtues of BT's products and its position among competitors, or the account of its lofty objectives actionable. *See Glassman,* 90 F.3d at 635–36; *Simon,* 945 F.Supp. at 428–29 (statements that company had a "global focus that many of [its] competitors do not," was "improving manufacturing efficiencies," and had "good opportunities to expand its products offerings" were "little more than sales talk" and immaterial). As long as an issuer declines, as BT did here, to supplement these kinds of remarks with specifics, they are mere puffery.

*Statement 20*

 On September 26, 1995, BT "announced a co-development agreement with VSI Enterprises, Inc. to develop products for the network-based video services market," and the fact that the products "were developed in 'record time' for introduction to the European market at [the] Telecom '95 trade fair at the beginning of October."

Plaintiffs' critique of this announcement is unclear. The generally alleged omissions are presumed to be intended by plaintiffs to apply, but the announcement bears no logical relation to any of them. The Complaint does assert, however, that:

VSI's Chairman and CEO is Richard Snelling, one of [BT's] directors. This development agreement and the resulting prod-

---

24. The Complaint does allege that the repurchase program itself was "intended to place a floor under any decline in [BT's] stock price and counteract the impact of any potential adverse

developments," but this fact is not relevant to an inquiry into whether the actual statement was made false or misleading by omission.

ucts were defendants' desperate attempt to boost the Company's entry into the European market, which they knew was in jeopardy, because of the Company's increasing inability to differentiate itself from its competitors, who unlike [BT], had established presences in the European market.

These allegations are largely irrelevant to the issue at hand—whether what was said was made materially misleading by omission. They primarily concern defendants' motive behind the effort discussed in the statement, not the facts which defendants might have known and culpably omitted when making the statement. If plaintiffs' intended claim is that Statement 20 was misleading because it failed to disclose BT's alleged struggle in the European market, it is meritless. The statement was an accurate report of two past accomplishments—the execution of an agreement and the speedy development of a new product. Neither touched on the broad topic of the health of BT's European business. The simple, narrow fact that product development was completed in time for a European trade fair did not require discussion of every fact of BT's efforts in Europe. The statement made no promise, prediction, or even suggestion as to how the new product— or, for that matter any of BT's products or business initiatives—would fare in the European market, or what European sales would do in the future. Defendants were not required to disclose the various facts raised by plaintiffs.

D. *"Control Person" Liability under Section 20(a)*

■ Count II alleges that the individual defendants violated Section 20(a) of the Securities Exchange Act of 1934. Section 20(a) provides for joint and several liability of individuals found to be "control persons"—often officers and directors of a defendant corporation.[25] While plaintiffs might have set forth sufficient allegations of control, Count II is dismissed. Section 20(a) liability is deriva-

tive of the issuer's liability, and where, as here, plaintiffs fail to state a claim under Rule 10b–5, the 20(a) count is disposed of accordingly. *See Suna,* 107 F.3d at 72.

\* \* \* \* \* \*

For the reasons stated, the defendants' Motion to Dismiss the Complaint is granted.

It is so ordered.

---

25. The statute provides:

Every person who, directly or indirectly controls any person liable under any provision of this title or of any rule or regulation thereunder shall also be liable jointly and severally with and to the same extent as such controlled person to any person to whom such controlled person is liable, unless the controlling person acted in good faith and did not directly or indirectly induce the act or acts constituting the violation or cause of action.

15 U.S.C. § 78t(a).